[Civ. No. 15118. First Dist., Div. One. Aug. 18, 1952.]

LUCILLE HELEN McGUIGAN, as Administratrix, etc., Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

Cosgriff, Carr, McClellan & Ingersoll and Frank A. Dutton for Appellant.

Arthur B. Dunne, R. Mitchell S. Boyd, Dunne, Dunne & Phelps and Robert L. Lamb for Respondent.

PETERS, P. J.—In this action, brought under the Federal Employers' Liability Act, the widow of James J. McGuigan seeks to recover damages for his wrongful death alleged to have been caused in interstate commerce by the negligence of the defendant employer, the Southern Pacific Company. At the conclusion of plaintiff's case, the trial court granted a nonsuit. Plaintiff appeals.

The facts most favorable to appellant show the following: The decedent was 51 years old at the time of his death, which occurred on May 1, 1948. At that time he had worked for the Southern Pacific at various jobs for some 28 years.

On October 20, 1947, the decedent had entered the Southern Pacific Hospital and had remained there as an in-patient until November 8, 1947. Diagnosis and electrocardiograms disclosed that he was then suffering from obesity, auricular fibrillation (irregular contraction of the chambers of the heart), dyspnea (shortness of breath), cyanosis (purplish hue to lips and ears), high blood pressure, possible left coronary occlusion and a widespread coronary artery pathology, including arteriosclerosis. The heart specialist at the hospital testified that the decedent, while in the hospital, lost 16 pounds and that, as a result, upon his discharge from the hospital, there was no longer a cardiac insufficiency, although the doctor had written on the discharge sheet that the "electrocardiogram shows evidence consistent with left coronary artery occlusion."

After his discharge from the hospital on November 8, 1947, decedent returned to work as a yardman. On February 13, 1948, one of the doctors in the hospital wrote to decedent informing him that, as a result of a review of his medical history, he should "report to General Hospital every 90 days for recheck" and should report to Dr. Kaufman, the heart specialist. Copies of this letter were sent to the general manager of the Southern Pacific and to the superintendent of its coast division. Pursuant to this letter the decedent reported to the hospital on February 20, 1948, and remained there as an in-patient until March 19, 1948. During this period further electrocardiograms and X rays were taken, disclosing a recurrence of the cardiac insufficiency. Hypertrophy of the heart muscle was disclosed, apparently high blood pressure causing an expansion of the heart muscle. Dr. Kaufman attempted to discount some of the symptoms then discovered by testimony to the effect that the cyanotic condition was somewhat less marked and the shortness of breath had improved. The record showed a fluctuating high blood pressure, which Dr. Kaufman discounted as not being of very great importance. But when decedent was discharged from the hospital on March 19, 1948, Dr. Kaufman refused to permit him to return to work, ordered the employee on three months' sick leave, and took the necessary and usual steps to preserve the decedent's seniority rights during his sick leave. Dr. Kaufman

informed decedent that during this period he should keep down his weight and get as much rest as possible.

Dr. Kaufman terminated the sick leave before the 90 days had expired. He testified that he did this because a representative of decedent's brotherhood had come to see Dr. Washburn, the head of the hospital, and represented that because of decedent's seniority he could work at the main depot in San Francisco as a herder, a position with lighter duties than those formerly performed by decedent. According to Dr. Kaufman, it was also represented by the union representative, that decedent was visiting the railroad yards daily and worrying himself sick because he was not working. Dr. Kaufman stated that, because of these representations, he agreed to terminate the sick leave. He admitted, however, that in making this recommendation he relied upon certain correspondence between the Southern Pacific and the hospital relating to decedent's disability, and the nature of his duties upon his return to work. This correspondence is important because the evidence is to the effect that the rule of the Southern Pacific is that the determination of fitness for duty is made by the hospital staff and not by the Southern Pacific directly. An employee on sick leave cannot be taken back on the job without a release from the hospital, and sick leave is ordered by the medical staff.

The correspondence shows the following: Under date of March 26, 1948, the chief surgeon advised the superintendent of the coast division of the Southern Pacific that decedent should be granted three months' sick leave, and then it would be determined if he could return to work. Under date of March 22, 1948, decedent was granted such leave, to expire June 22, 1948. Under date of April 14, 1948, the chief surgeon of the hospital wrote to the superintendent stating that he had been informed by the brotherhood representative that decedent, because of his seniority, could secure a job as herder in the San Francisco yard of the company, and had been informed that decedent's "duties as such would consist only of 'cutting off' locomotives as they arrive at the station and 'coupling' engines to passenger trains for departure; that he would have no physical effort to put forth, nor would he at any time have to jump on or off moving equipment.

"Before further considering him for such assignment I will appreciate your advising whether his duties would be limited to the extent cited."

The superintendent, who was quite familiar with the duties of a herder in the San Francisco yard, under date of April 20, 1948, replied to the above letter as follows: "If Mr. McGuigan were assigned as herder his duties would consist merely of cutting off inbound engines and coupling on outbound engines. There would be no mounting or dismounting of moving equipment involved, nor would there be any riding of equipment to be done."

There is another unsigned letter, dated April 23, 1948, probably an interoffice communication, addressed to J. W. Corbett, the general manager of the Southern Pacific, advising Corbett that decedent was not yet ready to return to his duties as a yardman, but that the doctor "advises he will be entirely safe in the position of herder . . . in which assignment he would have no great physical effort, nor be required to jump on and off moving equipment."

The chief surgeon sent to the superintendent a release dated April 29, 1948, authorizing the company to hire the decedent as a herder, and the general manager of the company authorized decedent's resumption of work "restricted to herder's duties under the conditions described."

Actually a herder's duties were substantially more strenuous than those described in these letters. Three operating employees of the Southern Pacific testified that it was standard and customary procedure for a herder to ride moving equipment and to jump on and off such equipment. While the yardmaster testified that a herder may ride moving equipment or not in his own discretion, that testimony, at most, merely created a conflict. The extent of a herder's duties is also disclosed by the evidence of what decedent actually did when he reported for work on May 1, 1948. When he left home that morning he looked and acted normal. He arrived at Third and Townsend Streets at 6:30 a. m. Because of his seniority, he had the right to select his shift, and he had selected this particular shift. He told the yardmaster of the terminal that the new job was "duck soup" and that he could "last a long while doing this." He started to perform his normal duties. There are two herders on duty at the terminal, one coupling outgoing engines, the other uncoupling incoming engines. Decedent uncoupled incoming engines. The peak period for incoming trains at this station is between 7:30 and 9 a. m. During that period decedent uncoupled some 12 to 14 engines from the commute trains as they arrived. This did not require him to walk more than 150 feet. The un-

coupling operation consists of lifting and pulling the cutting lever located between the first car and the engine. This can be done by leaning over about three feet from the cement ramp adjoining the track and stooping down and pulling the lever, or it can be done by jumping down to track level and then pulling the lever. In the latter event, the lever would be about waist high for the herder. This lever will give easily if there is slack between the car and the engine, and the herder has the right to ask the engineer to move the engine so as to create such slack. Some herders, rather than make such a request, will exert considerable pressure with both hands to move the lever. Just how decedent performed his duties on the commute trains does not appear in the evidence, but there is considerable evidence as to how he performed his duties in connection with the Lark, a train admittedly engaged in interstate commerce. When that train arrived at about 9 a. m., decedent uncoupled the engine without requesting that the engineer give him some slack. The engineer testified that decedent then signalled that the uncoupled engine should move away, and, after the engine had started up, jumped on a step located on the moving equipment. This step, located a couple of feet from the ground, is about a foot wide. Decedent grasped with both hands a vertical "grab iron" located on the tank of the engine, one hand being at about chin level and the other above his head. Decedent, as part of his regular duties with the Lark, rode in this manner across Third Street. There the engine stopped and decedent, as part of his regular duties, was there required to throw a so-called "cellar" type switch. This switch is located below ground level and is covered with a hinged iron door. This door is at ground level, is between a half to three-quarters of an inch thick and is about 3 feet long and 1 foot wide. The testimony as to its weight is conflicting, there being some evidence that it weighs as much as 50 pounds, while other witnesses estimated its weight at about 35 pounds, or less. The herder is required to lift this cover, lean down below the surface of the ground, pull up a peg and lift the switch handle and throw it over. To reach this switch the herder has to cross the tracks behind the engine because the switch is located on the side opposite where the step on the engine is located. Decedent performed these operations, crossed behind the engine and signalled the engineer to back up on the track leading to the roundhouse, and then jumped on the engine in his former position. The engine then continued to back towards Fourth Street. The herder, in the

performance of his normal duties, was required to ride towards Fourth Street because at that street there is another switch which it is his duty to see is properly adjusted so that the engine may proceed to the roundhouse. There is a target light on this switch that indicates how it is set, and this can be seen from some distance away. When the engine had proceeded about half way of the distance towards Fourth Street at a speed estimated at 3 to 6 miles per hour, the target light became visible, and indicated that the switch was set so that the engine could proceed to the roundhouse. Decedent thereupon jumped off the moving equipment. He took two or three quick steps, and then fell on his back. He never opened his eyes or spoke again. His lips turned blue, he gave several gasps, and quivered once or twice. He was dead when the ambulance arrived.

The autopsy surgeon testified by deposition. He fixed the cause of death as "Hypertensive arteriosclerotic heart disease with actue coronary thrombosis and nephrosclerosis." He testified, in elaboration, that the coronary arteries showed marked hardening, and that the left artery was occluded completely by a firm red thrombus. The heart was greatly enlarged, caused by increased resistance of the arteries to the blood flow in general. The hardening of the arteries of the type here existing, which he found to be widespread throughout the arterial system, interferes with the heart's functions, particularly when there is exertion. The immediate cause of death was a thrombus, or clot, which could have occurred within a few minutes of death, or up to several days before the death. He was quite sure that it had occurred within 12 hours of the death.

A qualified heart specialist was called as a witness for the plaintiff. She testified that hanging on to the engine, as decedent did, put an extra strain on his diseased heart; that the various symptoms as disclosed by the hospital doctors and the records were all indicative of an embarrassed heart. In response to a hypothetical question outlining decedent's medical history and his activities on the fatal morning of May 1, 1948, the witness testified that, in her opinion, the activities of that morning were a contributory cause of the death. She pointed out how easily a hardened artery may be closed entirely when subjected to strain, and opined that riding on the locomotive in the manner disclosed by the evidence put a strain upon decedent's diseased and embarrassed heart

"because the very act of grabbing increases the blood supply to the arms. It may decrease it to the heart, and he had a bad heart to begin with, and it is the kind of thing that you just don't let patients with that heart condition do." She also opined that lifting the switch box lid and throwing the cellar type switch put an extra strain on decedent's diseased heart and could have been a producing cause of the coronary thrombosis. She went on to explain that any activity decedent engaged in the day of his death could have contributed to his death, and that the strain of the work that morning could have formed the clot by slowing down the rate of the blood flow. She stated that decedent should not have been at work at all, that he should not have been doing the type of work that he did perform that morning, and that she was reasonably certain that his activities that morning "were a contributing factor to his death." She thought that he should not have been permitted to perform any but sedentary work, and that complete rest was called for. Under proper care, which primarily meant rest, decedent might well have lived another five to seven years.

It will be remembered that before the hospital doctors would release decedent from his sick leave they inquired in writing of decedent's superiors in the company as to the nature of the duties decedent would be required to perform as a herder, and were informed that he would merely couple and uncouple engines, and that he would not be required to mount on or dismount from moving equipment. Dr. Kaufman testified that he had this correspondence and the representations therein made as to the nature of the duties in mind when he released decedent to go back to work, and that such correspondence definitely had a bearing on that decision. He believed the representations there made. He further testified, however, that he knew, without asking, that a herder had to throw switches, but did not know that decedent would be required to throw a cellar type switch of the kind here involved. Nevertheless, he testified that in view of the nature of decedent's past work experience, he still would have permitted the decedent to go back to work even though he had known that decedent would have to operate the cellar type switch and would have to mount and dismount moving equipment as disclosed by the evidence. He then admitted that he might not have permitted decedent to return to work had he known that after decedent left the hospital on March

19, 1948, and until May 1, 1948, decedent had spent most of his time in bed and was not up and around.*

There is only one other phase of the evidence to which reference should be made, and that is to the relationship between the Southern Pacific, the hospital and decedent. It must be remembered that the Southern Pacific is the sole defendant, and that any negligence of the doctors disclosed by the evidence is pertinent only if the Southern Pacific is chargeable with such negligence.

The hospital here involved is referred to as the hospital department, which was created in 1945 pursuant to an arbitration award rendered under the Railway Labor Act. This department is operated by a thirteen-member board of managers, six selected by the railroad brotherhoods, one by fourteen other unions, and six by the Southern Pacific. Under the award the Southern Pacific is empowered to nominate the chief surgeon, but such nomination, before it is effective, must be approved by the board of managers. The board fixes the chief surgeon's salary. The chief surgeon makes rules and regulations for the operation of the hospital, and appoints and fixes the salaries of the professional staff, all subject to the approval of the board. The title to the lands and buildings involved is vested in the Southern Pacific, but the hospital department pays the taxes thereon.

The hospital gets its income from various sources. Each employee of the Southern Pacific has deducted from his salary a fixed sum per month which goes to the hospital. This entitles the employee to medical care and hospitalization for nonindustrial injuries or diseases. In addition, the Southern Pacific pays the hospital for treating employees injured in the course and scope of their employment. Twenty other companies with payroll deduction plans also use and pay for the facilities of this hospital. From these sources the hospital department is operated. There is usually a small yearly cash surplus which is carried over for emergency purposes. The Southern Pacific furnishes the hospital with transportation of its supplies, the use of its communication facilities, advice from its engineering and purchasing departments, and with some accounting services. The Southern

---

*The doctor had previously testified that the brotherhood representative had told him that during this period decedent was visiting the yards daily. The plaintiff and her son testified that during this period, except for one trip to the yards, decedent never left the house, stayed in bed each day until noon, and would then relax on the chesterfield or return to bed in the afternoon.

Pacific derives direct financial benefits from these arrangements. It obtains treatment for the Southern Pacific employees, for whose injuries the company is liable, at about half the rate that is charged other companies, and, because the hospital makes the arrangements, it receives out-of-town treatment for on-duty injuries from local doctors at substantially a lower rate than it would pay did it deal directly with the local doctors. The hospital examines all employees whether engaged in interstate commerce or not, to ascertain their fitness for duty, and reports to the company. No charge is made by the hospital to the Southern Pacific for this service. These examinations are of benefit to the employees as well as to the company. The chief surgeon believed that he was performing a service to the company, and to the employees and to the public, inasmuch as the Southern Pacific is a public carrier, in determining whether an employee could, with safety to himself and to the public, perform his assigned duties.

On this evidence the trial court granted a nonsuit. This, in our opinion, was clearly error.

As already pointed out, this action was brought under the Federal Employers' Liability Act (45 U.S.C.A., §§ 51 to 60). Section 51 of that act provides that:

"Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow . . . of such employee; . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, . ...

"Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce . . . shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."*

Section 53 of the act provides that the contributory negligence of the employee shall not bar a recovery by him, but, except in certain limited cases, shall result in a proportional

---

*This paragraph was added to section 51 by amendment in 1939.

diminution of damages. Section 54 abolishes the common law doctrine of assumption of risk.

 Where this act is applicable, the federal remedies provided are exclusive. (*Hines* v. *Industrial Acc. Com.*, 184 Cal. 1 [192 P. 859, 14 A.L.R. 720].) When the action is filed in the state courts, as it may be (§ 56), only procedural matters are governed by state law. On all matters of substance federal law governs. (*Ellis* v. *Union Pac. R. Co.*, 329 U.S. 649 [67 S.Ct. 598, 91 L.Ed. 572].) Whether the evidence is sufficient to go to the jury or whether a nonsuit should be granted is clearly a matter of substance and so governed by federal rather than state law. (*Willis* v. *Pennsylvania R. Co.*, 122 F.2d 248.) An examination of the cases discloses that the federal law on the subject of nonsuits is substantially the same as that existing in this state, namely, that if there is any substantial evidence or reasonable inferences therefrom that would sustain findings of negligence and proximate cause, it is error to grant a nonsuit. While the so-called scintilla of evidence rule has been rejected by the federal courts (*Brady* v. *Southern Ry. Co.*, 320 U.S. 476 [64 S.Ct. 232, 88 L.Ed. 239]), they have almost uniformly interpreted the act liberally to the end that cases should be submitted to the jury whenever reasonably possible. (*Wilkerson* v. *McCarthy*, 336 U.S. 53 [69 S.Ct. 413, 93 L.Ed. 497]; *Bailey* v. *Central Vermont Ry. Co.*, 319 U.S. 350 [638 S.Ct. 1062, 87 L.Ed. 1444].)

 In the instant case the defendant is indisputably a railroad common carrier. It admits in its pleadings that the Lark, the train upon which plaintiff was working at the time of his death, carried paying interstate passengers. Such train was, therefore, without question, engaged in interstate commerce. But defendant makes the general contention that the entire series of events disclosed by the record were so disconnected from interstate commerce that plaintiff has not proved any cause of action at all under the act. In this connection defendant cites several pre-1939 cases as to what constitutes interstate commerce. (*Delaware, L. & W. R. Co.* v. *Yurkonis*, 238 U.S. 439 [35 S.Ct. 902, 59 L.Ed. 1397], decided in 1915, and *Chicago & E. I. R. Co.* v. *Industrial Commission*, 284 U.S. 296 [52 S.Ct. 151, 76 L.Ed. 304, 77 A.L.R. 1367], decided in 1932.) Obviously, the 1939 amendment was intended to and did liberalize the limited rule announced in these and other cases. Defendant places considerable reliance on *Metzger* v. *Western Maryland Ry. Co.*, 30 F.2d 50 (decided in 1929), where it was held that an employee treated by

a company doctor has no cause of action under the act for injuries suffered as a result of the doctor's negligence, even though the injury for which treatment was given was an on-duty injury, because such treatment did not occur in interstate commerce.

In citing such cases, and in making the broad contention now under discussion, defendant not only fails to give any effect to the broadening of liability amendment to section 51 in 1939,* but apparently overlooks the fundamental fact that, in the instant case, at the precise moment of death the employee was engaged in interstate commerce in that he was working on an interstate train. Therefore, if there is any substantial evidence, or reasonable inferences therefrom, that would sustain a finding that the death was attributable to any negligence on the part of the employer it is obvious that such death occurred while the employee was working in interstate commerce.

The parties argue many interesting questions in their respective briefs. Much is said as to the legal relationship between the hospital and the employer and the employee. Defendant vigorously argues that it is not legally responsible for the negligence, if any, of the doctors in the hospital, because such doctors are not its employees or agents. Plaintiff contends to the contrary, and also argues that the railroad assumed the duty of examining employees to determine whether they, with safety to themselves, to the employer and to the public, could return to work, that such duty was not delegable, and that it was negligence on the part of the company, under the circumstances, to return the decedent to work without a new examination. Much is said on the question as to whether the evidence shows negligence on the part of the hospital doctors, or a mere error in judgment. These, and some of the other questions argued, are all very interesting indeed, but they need not be discussed in this opinion, because we are of the view that there is substantial, credible, and reasonable evidence, and reasonable inferences therefrom, that would sustain findings that the Southern Pacific was directly negligent in helping to induce the doctors to consent to terminate decedent's sick leave and to return him to work

---

*All that is now required is that ''any part'' of the employee's duties be in the ''furtherance'' of interstate commerce, or ''in any way directly or closely and substantially, affect such commerce'' to have injuries received as a result of the employer's negligence covered by the act.

as a herder, and that such negligence was a direct and proximate cause of the death, which occurred in interstate commerce.

■ The employer knew that decedent had a diseased heart. The employer know that twice decedent had been hospitalized for that condition. In April of 1948, the employer knew that decedent was on sick leave and that such sick leave would not terminate until June 22, 1948. The employer knew that under the customary procedure it had adopted, the decedent, even after the termination of his sick leave, could not return to work without a medical clearance. Certainly, the employer knew that under customary procedure the sick leave could not be terminated without a medical clearance. It knew all this, and also knew that the doctors at the hospital, whose duty it was to grant or to deny requests for termination of sick leave, were trying to find out the nature of the job that decedent would occupy if he returned to work so that they could determine whether he could, with safety to himself, his employer and to the public, return to work. The employer knew, when its superintendent of the coast division received the letter of April 14, 1948, from the chief surgeon, that that letter was written in order to ascertain whether the job of herder could safely be performed by decedent. The employer knew, because the letter said so, that the chief surgeon had been informed that the duties of such a herder would consist solely of coupling and uncoupling engines, and "that he would have no physical effort to put forth, nor would he at any time have to jump on or off moving equipment." Then the letter concluded that before the doctor would consider decedent for such an assignment he wanted to know if the "duties would be limited to the extent cited." This letter is perfectly clear. Its purpose was fully disclosed. There is no ambiguity. Nor is there any ambiguity in the reply of the superintendent of April 20, 1948. The superintendent directly and unequivocally stated that if decedent were permitted to return as herder "his duties would consist merely" of coupling and uncoupling engines. Then he stated "There would be no mounting or dismounting of moving equipment involved," and then to make his meaning doubly clear, concluded "nor would there be any riding of equipment to be done." When he made these representations the superintendent knew that the duties of herder were more strenuous than he had represented. He knew that herders at the Third and Townsend Streets yard customarily rode on some of the

trains, and customarily mounted and dismounted from them while they were moving. He knew that herders had to throw switches, and knew that if decedent started to work on this job he would have to throw the cellar switch at Third Street. His failure to disclose this information was undoubtedly negligence.

Defendant argues that there were no misrepresentations made because all concerned were railroad men and they all knew what the general duties of herders were. It is argued that the mounting and dismounting of equipment, and the other activities here disclosed, were not the type of activity referred to in the letters. On this appeal, from a judgment of nonsuit, this contention is untenable. The letters are clear and unambiguous. The doctor wanted to know if decedent would have to ride equipment and mount or dismount therefrom. The superintendent said ''no.'' The evidence shows that decedent was required to ride equipment and mount and dismount from it while it was moving.

But, says the defendant, the doctor testified that he would have terminated the sick leave even had he known of these duties that had been misrepresented to him, so that the misrepresentations could not have been the proximate cause of the subsequent death. This argument, too, is untenable. This is an appeal from a judgment of nonsuit. Only that evidence favorable to the plaintiff need be considered. Had this case gone to the jury it could have disbelieved this testimony of the doctor for the reason that this portion of the doctor's testimony is inherently improbable. Here was a doctor writing to an employee's superior officer to ascertain the nature of the employee's proposed duties. In that connection he wanted to know certain specific things—would the employee have to ride equipment and mount and dismount from such equipment while it was moving? The doctor gets his answer—the employee will only have to couple and uncouple engines. No other exertion required, and, in particular, the employee won't have to mount and dismount moving equipment. The doctor testified that he relied on the superintendent's representations in terminating decedent's sick leave. But then he testified that, even had he known the true facts, he would still have terminated the sick leave. If this last evidence is true, then why did he ask the questions in the first place? Why did he send the letter? It is, to say the least, a reasonable if not an inevitable inference that he wrote because he

wanted certain information, and that when he got that information, he relied upon it. It is a reasonable inference that the doctor relied on the information negligently given by the superintendent, and that such negligence was a proximate cause of terminating the sick leave and putting decedent on a job too strenuous for his embarrassed heart.

It is perfectly- true that there is no duty imposed on an employer to examine his employees to ascertain if they are physically fit to do the job they seek. The case of *Potter Title & Trust Co.* v. *Ohio Barge Line*, 81 F.Supp. 108, which imposed such a duty was reversed—184 F.2d 432 (cert. denied, 340 U.S. 955 [71 S.Ct. 567, 95 L.Ed 689]). But here the employer not only voluntarily assumed the duty, but, much more important, took it upon itself to describe the duties decedent would assume, and did so negligently. Even if the employer was under no duty to examine decedent before per-mitting him to return to work, and even if it had been under no duty to answer the letter of inquiry of the chief surgeon, it assumed that duty and then performed it negligently. It is elementary law that the voluntary assumption of a duty by affirmative conduct creates the duty to use due care in performing the assumed task. (Prosser on Torts, pp. 194-197.)

Thus we have a duty—a duty to use due care in describing the duties to be assumed. We have a violation of that duty, a negligent and incorrect description of the duties. Do we have enough to go to the jury on the issue of proximate cause? As already pointed out, it is reasonable to infer that the doctors relied on the letter of the superintendent and that, had the duties been described accurately, the sick leave would not have been terminated. We have medical evidence that decedent should not have been returned to work to perform the duties that he was required to perform, and which were misrepresented in the superintendent's letter. We must assume that the hospital doctors were reasonably competent and would not have returned decedent to work had they known the true facts. We have medical evidence that these duties contributed to the occlusion resulting in death. Thus, independent of any question of malpractice on the part of the doctors, or of the employer's liability for such negligence, we have evidence which, if believed, would sustain a finding of negligence on the part of the employer, and a finding that such negligence was a contributing cause of the death which occurred while decedent was working in interstate commerce.

That made out a prima facie case under the Federal Employers' Liability Act. It was, therefore, error to have granted the nonsuit.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 17, 1952, and respondent's petition for a hearing by the Supreme Court was denied October 16, 1952. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.