[Civ. No. 16046. First Dist., Div. One. Dec. 13, 1954.]

LUCILLE HELEN McGUIGAN, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Arthur B. Dunne, R. Mitchell S. Boyd, Dunne, Dunne & Phelps and Robert L. Lamb for Appellant.

Cosgriff, Carr, McClellan & Ingersoll, Luther M. Carr and Frank A. Dutton for Respondent.

PETERS, P. J.—James J. McGuigan, while working at his job of herder for the Southern Pacific Company, suffered a heart attack from which he died. His widow brought this action under the Federal Employers' Liability Act to recover damages for the death of her husband, it being claimed that the death resulted from the negligence of the employer, or from the negligence of others for whom the employer is liable. The sole defendant named is the employer, the Southern Pacific Company.

The action has been twice tried. On the first trial the defendant's motion for a nonsuit was granted. This judg-

ment of nonsuit was reversed. (*McGuigan* v. *Southern Pac. Co.*, 112 Cal.App.2d 704 [247 P.2d 415].) On the second trial a jury verdict against defendant in the sum of $16,005 was returned. From the judgment entered on that verdict the defendant appeals.

Appellant concedes that, with unimportant minor exceptions, the evidence on the two trials was substantially the same. The facts, generally, are as follows:

On October 20, 1947, the decedent who had been employed by appellant for some 28 years, pursuant to the prevailing rules and practices of the employment, entered the Southern Pacific Hospital and remained there as an in-patient until November 8, 1947. His entrance report states that he then suffered from obesity, auricular fibrillation, and possible left coronary occlusion. Diagnosis and electrocardiograms disclosed evidence consistent with left coronary artery occlusion and auricular fibrillation, hypertrophy of the heart, and a widespread coronary artery pathology consistent with arteriosclerosis. Dr. Kaufman, the heart specialist at the hospital who had examined decedent, testified that he then suffered, in addition, from hypertension. The decedent told the doctor that he had been hypertensive for a period of at least 10 years. Decedent's discharge report stated that, while in the hospital, decedent had lost 16 pounds, and there was, upon discharge, "no evidence clinically of cardiac inefficiency," although the doctor had also written that the "electrocardiogram shows evidence consistent with left coronary artery occlusion and auricular fibrillation."

After discharge from the hospital on November 8, 1947, decedent returned to work as a yardman. On February 13, 1948, the office of the chief surgeon of the hospital informed decedent by letter that, because of his medical history, he should "report to General Hospital every 90 days for recheck," and should there see Dr. Kaufman, the heart specialist. Copies of this letter were sent to the general manager of the appellant and to the superintendent of its coast division. As a result of this letter the decedent reported to the hospital on February 20, 1948, and remained there again as an in-patient until discharged March 19, 1948.

During this period further diagnosis, including the taking of electrocardiograms, disclosed some early cyanotic changes, some shortness of breath, and tremor of the hands. Dr. Kaufman testified that on March 19, 1948, he determined that, because of decedent's then physical condition, he should not

return to his duties as yardman for 90 days. His medical report as of that date indicated the nature of decedent's then illness to be auricular fibrillation, right coronary artery; dyspnea; cyanosis; a widespread coronary artery pathology, and generalized hypertrophy of the heart muscle. Dr. Kaufman did not examine the decedent again after March 19th, and could not recall whether he had informed him of any of his specific ailments. He told him, in layman's language, that he had a bad heart condition. He was advised to keep his weight down and to continue the medication given him. Under dates of March 19, and March 26, 1948, the chief surgeon advised the superintendent of the coast division of the appellant that decedent should be granted three months' sick leave, and then it would be determined if he could return to work.

Dr. Kaufman terminated the sick leave before the 90 days had expired. He testified that sometime after March 19, 1948, he discussed with Dr. Washburn, the chief surgeon, the advisability of letting decedent return to work as a herder. Dr. Kaufman stated that he was personally aware of a herder's duties and "could see no physical basis where it would not be fair to him [McGuigan] to go back to work as a herder." Moreover, since the decedent did not get in touch with him, as he had done previously when ill, he presumed his physical condition was such that he was able to do the work. Dr. Kaufman also testified that he knew a herder was not required to mount moving equipment, but could if he wanted to, and that the herder controlled the engine.

This decision to let decedent return to work was made after an exchange of letters between Dr. Washburn and J. J. Jordan, the coast division superintendent of appellant. Dr. Kaufman knew of this correspondence and relied upon it in making his decision. This correspondence, according to Dr. Washburn, was the result of conversations he had had with the decedent and Mr. Katz, also a witness at this trial. Katz was the representative and grievance man of the decedent's brotherhood. Katz told Washburn that decedent was upset because he was idle and was very anxious to get back to work on the daylight shift, and that decedent was so restless that he had visited the railroad yards a number of times. The decedent, because of his seniority, was entitled to his choice of any job in the San Francisco terminal for which he was qualified.

Under date of April 14, 1948, the chief surgeon wrote to the superintendent of the appellant stating that he had been informed by the brotherhood representative that decedent wanted to go back to work as herder in the San Francisco yard of the company, and had been informed that decedent's "duties as such would consist only of 'cutting off' locomotives as they arrive at the station and 'coupling' engines to passenger trains for departure; that he would have no physical effort to put forth, nor would he at any time have to jump on or off moving equipment.

"Before further considering him for such assignment I will appreciate your advising whether his duties would be limited to the extent cited." This letter was written because of the admitted rule of operation of appellant that the determination of fitness for duty must be made by the hospital staff. An employee on sick leave cannot be taken back on the job without a certification from the hospital.

The superintendent, who was thoroughly familiar with the duties of a herder in the San Francisco yard, under date of April 20, 1948, replied to the above letter as follows: "If Mr. McGuigan were assigned as herder his duties would consist merely of cutting off inbound engines and coupling on outbound engines. There would be no mounting or dismounting of moving equipment involved, nor would there be any riding of equipment to be done."

It should also be mentioned that the office of J. W. Corbett, the vice-president in charge of operations of the appellant, delivered a communication to Dr. Washburn dated April 29, 1948, to the effect that he had no objections to the chief surgeon "advising Superintendent Jordan that McGuigan may be restricted to herder's duties under the conditions described." Under these circumstances the hospital signed a release authorizing the company to hire the decedent as a herder, and the general manager of appellant authorized decedent's resumption of work as herder.

The actual duties of a herder were described by several operating employees of appellant. These descriptions differed in several material respects from those portrayed in the correspondence. Specifically, the duties with reference to one train, the "Lark," were detailed by an engine foreman as follows:

"When the Lark pulls in, the herder generally stands where he cuts the engine off, and there will be a car man there, and he takes and cuts the steam hose and the air, and the

electrician cuts off the electric line; he disconnects the electricity, and then when everything is all cut they tell him, 'All right,' and the herder will have the slack taken off; if the slack is not off he calls for the engine to back a little, and then he pulls the pin and gives the signal to go ahead. Q. And jumps on? A. Just as it moves the herder gets on and rides across, and then when he gets on the other side of Third Street there is the cellar switch, and when the engine goes over that he walks behind down on the other side, on the fireman's side, and lifts up the lid to throw the switch, and walks back to the other side and gives the signal to back up. And then when the engine goes he gets on the tender to ride over. I generally ride over toward Fourth Street, the switch over there, it being around the curve, I would ride over there and as soon as I could see that and I figured everything was clear for him, the other switch, get off.''

While the job was described as ''easy and monotonous'' the evidence was definite that it was the custom of the herders to ride the moving equipment and to lift the heavy cellar switch.

The decedent went back to work at 6:30 a.m. on May 1, 1948. Upon arrival he told the yardmaster that the new job was ''duck soup'' and that he could ''last a long while doing this.'' There were two herders on duty at the terminal, one coupling outgoing engines, the other, the decedent in this instance, uncoupling incoming engines. Between 6:30 a.m. and 9 a.m. decedent uncoupled some 13 engines. The Lark arrived at about 9 a.m. Decedent uncoupled the engine and gave the engineer the signal to go ahead, and then rode across Third Street on the tender, a distance of about 324 feet. To accomplish this decedent jumped onto a step on the tender located about a foot from the ground, and then held onto a vertical hand rail running to the top of the tank. His hands necessarily grasped the pole at about the level of his head. After crossing Third Street, decedent dismounted in order to throw the cellar switch there located. This switch is below the level of the ground and is covered by an iron lid about ½ inch thick, 3 feet long and about 1 foot wide. The engine foreman judged that the cover weighed between 30 and 40 pounds. The herder is required to lift this cover, reach down 6 to 8 inches below the surface of the ground and pull up the switch handle. Decedent performed this

operation, crossed behind the engine, and signalled the engineer to back up across Third Street on the track leading to the roundhouse toward Fourth Street. Decedent then remounted the moving equipment, resuming his former position. As was customary, he rode the backing equipment, approximately halfway to Fourth Street. On that track there is another switch, which has a target light, for whose alignment the herder is responsible. This target light is so located that the herder can see it some distance before arriving at Fourth Street. On the trip in question, the engine had gone about halfway to Fourth Street at a speed estimated at 3 to 6 miles per hour when decedent must have observed that the target switch was aligned, as he did not signal the engineer to stop. Decedent jumped off the moving train when it was going about 3 or 4 miles per hour, made a half turn, and then fell on his back. His lips turned blue, he gasped and quivered, and apparently died soon thereafter.

The autopsy surgeon fixed the cause of death as "Hypertensive arteriosclerotic heart disease with acute coronary thrombosis and nephrosclerosis." He testified, in elaboration, that the coronary arteries showed marked hardening, and that the left artery was occluded completely by a firm red thrombus. The heart was greatly enlarged, caused by increased resistance of the arteries to the blood flow in general. The hardening of the arteries of the type here existing, which he found to be widespread throughout the arterial system, interferes with the heart's functions, particularly when there is exertion. The immediate cause of death was a thrombus, or clot, which could have occurred within a few minutes of death or up to several days before death. He was quite sure that it had occurred within 12 hours of death.

A heart specialist, Dr. Rose, testified as a witness for the plaintiff. In response to a long hypothetical question outlining decedent's medical history and his activities on the fatal morning of May 1, 1948, the witness testified that the activity of the last 5 or 10 minutes prior to decedent's death, in her opinion, "precipitated the acute coronary artery thrombosis and therefore caused his death." A man with a heart condition such as decedent, in this witness' opinion, should have had a sedentary job. In answer to what specially produced the coronary thrombosis, the doctor answered that lifting his own weight of 174 pounds onto the side of the tender could have been enough, but that "the combination—I think everything that he did on that day was contributory."

The defense produced Dr. Bruck as a qualified medical expert. It was his opinion that the thrombosis did not result from any physical activities engaged in that morning, because the thrombosis could not have been formed in a few minutes. In the opinion of this doctor the exertion by decedent of lifting his own weight would be no more than ordinary exercise. Such moderate exercise would not be objectionable to a patient in decedent's condition.

Some reference must be made to the relationship between the Southern Pacific, the hospital, and decedent. This relationship was described as follows in our earlier opinion (112 Cal.App.2d 704, 712 [247 P.2d 415]):

"The hospital here involved is referred to as the hospital department, which was created in 1945 pursuant to an arbitration award rendered under the Railway Labor Act. This department is operated by a thirteen-member board of managers, six selected by the railroad brotherhoods, one by fourteen other unions, and six by the Southern Pacific. Under the award the Southern Pacific is empowered to nominate the chief surgeon, but such nomination, before it is effective, must be approved by the board of managers. The board fixes the chief surgeon's salary. The chief surgeon makes rules and regulations for the operation of the hospital, and appoints and fixes the salaries of the professional staff, all subject to the approval of the board. The title to the lands and buildings involved is vested in the Southern Pacific, but the hospital department pays the taxes thereon.

"The hospital gets its income from various sources. Each employee of the Southern Pacific has deducted from his salary a fixed sum per month which goes to the hospital. This entitles the employee to medical care and hospitalization for nonindustrial injuries or diseases. In addition, the Southern Pacific pays the hospital for treating employees injured in the course and scope of their employment. Twenty other companies with payroll deduction plans also use and pay for the facilities of this hospital. From these sources the hospital department is operated. There is usually a small yearly cash surplus which is carried over for emergency purposes. The Southern Pacific furnishes the hospital with transportation of its supplies, the use of its communication facilities, advice from its engineering and purchasing departments, and with some accounting services. The Southern Pacific derives direct financial benefits from these arrangements." Not only does

it obtain treatment for its employees for injuries on the job at one-half the actual cost of such care, but without charge the hospital examines railroad employees to determine their physical fitness for duty and certifies the result of such examination to the employer. According to the chief surgeon this function was assumed by the hospital without the adoption of a formal rule, it being his opinion that it was a normal function of the hospital for the benefit of the employer to safeguard the health of the employees and to protect the public.

The first contention made by appellant is that, regardless of whether it or the hospital doctors were negligent in sending decedent back to work, there is no substantial evidence to support a finding that the work decedent performed on the morning in question proximately caused his death. This point requires but scant consideration. It was discussed at some length in our prior opinion, and that discussion need not be repeated here. It was there held that there was sufficient evidence to go to the jury on the issue of proximate cause. That same evidence is ample to support the implied finding of the jury on the issue.

In making the contention that there is nothing in the evidence to indicate that the job caused the death, appellant not only necessarily disregards much of what was said in our prior opinion, but distorts the testimony of respondent's witness, Dr. Rose, by emphasizing a very small part of her testimony, by considering that part out of context, and by then contending that her testimony was based on a misconception of the facts. According to appellant's analysis of Dr. Rose's testimony she is supposed to have admitted that decedent could have safely performed all of his required duties except one, that is, climbing hurriedly to the top of the engine after stepping up 3 or 4 feet to the first rung of the ladder. Of course, the record shows that decedent performed no such acts. Therefore, says appellant, there is no evidence that any required or performed duty contributed to the death. Appellant also spends much time pointing out minor variances in the testimony of the doctor on the two trials. The basic question on this phase of the case was, did the duties performed that morning proximately contribute to the death? On this question Dr. Rose was most clear and direct. There was submitted to her a hypothetical question which included a correct summary of decedent's physical condition and an accurate résumé of the duties performed by him on the day of his death. In response to this question

Dr. Rose testified that, in her opinion, "the activity within the last five or ten minutes prior to his death precipitated the acute coronary artery thrombosis and therefore caused his death." The doctor also opined that a man in decedent's condition could precipitate a coronary thrombosis by simply pulling his weight up while mounting the ladder on the tender. She stated that everything he did that morning contributed to the thrombosis. Any conflicts in the testimony between the witnesses, or in the testimony of any witness, whether there were variances in the testimony of any witness on the two trials, and the effect to be given to such variances were jury questions. A fair reading of the record demonstrates that there is ample medical testimony to sustain the implied finding of causation.

The next question is to determine whether anyone was negligent in sending decedent back to work. The appellant was obviously negligent, independently of any negligence on the part of the hospital staff. It knew of its employee's heart condition. It knew that the doctors had ordered the employee to take a 90-day sick leave because of that condition. It knew that the employee could not go back to work even then without a clearance from the doctors. It knew that the doctors were making inquiry of it to ascertain in general the nature of a herder's duties, and, in particular, whether "physical effort" was required on the job and whether "he at any time [would] have to jump on or off moving equipment." It knew or should have known that those questions were being asked because if such duties were required the doctors would not permit the decedent to perform them—in other words, that the doctors believed such duties would be dangerous to the health and life of decedent. With such knowledge, and knowing the duties of a herder included these acts, the employer carelessly, negligently and falsely represented the nature of those duties by stating that "there would be no mounting or dismounting of moving equipment involved, nor would there be any riding of equipment to be done." This was, to say the least, negligence that proximately contributed to the death. This point was considered at length in our prior opinion, and what was there said need not be here restated.

Appellant does not seriously question the sufficiency of the evidence to sustain the implied finding that the above acts constituted negligence on its part, but, as a foundation for a point later made, urges that there is no evidence to

support a finding that the hospital doctors were negligent. The issue of the doctors' negligence was submitted to the jury. Appellant claims that, at most, the record shows nothing more than a possible wrong diagnosis on the part of the doctors, and a wrong diagnosis or a difference of opinion between doctors does not constitute negligence. (See *De Zon* v. *American President Lines*, 318 U.S. 660, 671 [63 S.Ct. 814, 87 L.Ed. 1065].)

While the negligence of the doctors is not as obvious as that of appellant, there is ample and substantial evidence that, independently of any possible wrong diagnosis, would support a finding that the doctors, in several respects, were negligent. Both doctors knew of decedent's condition. They had ordered him to take a 90-day leave of absence because of that condition. Nevertheless, they failed to reexamine him between March 19, 1948, the date on which they had determined that his condition required at least a 90-day leave, and May 1, 1948, the day they permitted him to return to work, after cutting the 90-day leave short. No attempt was made to determine whether his heart condition had improved or become worse or remained static in the meantime. Moreover, the doctors not only failed to tell decedent the nature of his condition, but they failed to tell him that lifting his weight by grabbing onto a vertical bar, and mounting and dismounting moving equipment would be dangerous, and that he was to be reemployed only on condition that he was not to do these things. Moreover, Dr. Rose testified that a man in decedent's condition should have been permitted to perform only sedentary work, and should not have been permitted to perform any of the duties of herder. This evidence is sufficient to support an implied finding that the doctors were guilty of negligence proximately contributing to the death.

Thus, under the evidence, and the instructions, the jury could have found that either or both the appellant and the doctors were negligent. Of course, if the jury found appellant was guilty of negligence it would be immaterial whether it also found that the doctors were or were not negligent, because the appellant would then be liable at least as a joint tort feasor. But if the jury found (in view of the evidence this seems highly unlikely) that appellant was not guilty of any independent negligence but that the doctors were negligent, then appellant could be held liable for the doctors' negligence only if the jury also found that

some relationship existed between appellant and the doctors so as to make the former liable for the negligence of the latter. Under the provisions of the Federal Employers' Liability Act, responsibility of the employer is limited to cases where the negligent third person is an officer, agent or employee of the employer.

The jury was instructed at length that if the doctors were found to be agents of the appellant to determine the physical fitness of the employer's employees, and if the doctors were negligent, the appellant would be liable. These instructions correctly defined agency, scope of authority, and necessity for right of control. These instructions are attacked by appellant on the theory that even if an agency existed, the doctors being licensed professionals, the principal, a non-professional, cannot be held liable for their negligence. This point need not be discussed at length. If an agency relationship existed it seems clear to us that the normal rules of agency apply. This being so, these instructions correctly stated the law.

These instructions were followed by an instruction to the effect that, even if the jury found appellant not independently negligent, appellant would still be liable if the doctors were negligent whether the doctors were agents or independent contractors. This instruction reads as follows: "In the event you find that neither the hospital department of the Southern Pacific, nor the physicians employed therein were agents of the defendant carrier on May 1, 1948, or in their dealings with plaintiff's intestate, but were acting as independent contractors by agreement with the Southern Pacific Company, then you are instructed that if you find that defendant voluntarily assumed the duty to ascertain the physical fitness of its employees for employment, it was the duty of the defendant carrier to protect the plaintiff's intestate McGuigan from being employed in a job for which he was physically unfit or incapable, and even though this duty was delegated to said hospital department and its doctors as an independent contractor, the defendant carrier is responsible for the negligent conduct of said independent contractor, and its servants and employees, if any, in performing such duty."

Of course, a defendant is not normally liable for the negligent acts of an independent contractor. But that rule is not here applicable, because it is our opinion that, as a matter of law, the hospital and its doctors were "agents"

of the appellant within the meaning of the Federal Employers' Liability Act. This hospital undoubtedly, in many respects, may be considered an independent agency. But insofar as it operates by performing the duties assigned by the employer to examine employees to determine their fitness for work, and such operations benefit the employer, the doctrine of *respondeat superior* applies.

The relationship between the hospital and the appellant has already been fully described in this opinion. From that description it appears that the hospital is supported by joint contributions of the employer and employees, the hospital has a separate accounting system, and the control of the board of managers is a joint control. The employer selects the chief surgeon who selects the staff doctors, subject to approval of the managers. From these operations "The Southern Pacific derives direct financial benefits" (112 Cal. App.2d at p. 712 [247 P.2d 415]) which have already been described.

The evidence as to these facts is uncontradicted. Under such circumstances, insofar as the hospital operates to perform the duty assumed by the appellant of examining employees to determine their fitness for work for the direct benefit of the employer, the doctrine of *respondeat superior* applies as a matter of law.

The cases on this subject are not clear-cut. It seems to be the general rule that an employer who undertakes gratuitously to furnish medical attention to his employees is liable only if he is negligent in the selection of the physician, and is not liable for the negligence of the doctor, although there are cases to the contrary. (See cases on both sides of this question 56 C.J.S. p. 820, § 165.) This same limitation on the liability of the employer probably exists where the employer, without profit to himself, administers a medical service fund for the benefit of the employees, with deductions made from employee's salaries (*ibid.* p. 821). But where the medical services are furnished under circumstances that a direct benefit to the employer results, the employer is liable for the negligence of the doctors (*ibid.* p. 822). One statement of this rule, supported by several cases, is set forth as follows in 35 American Jurisprudence page 540, section 112: "A relief department which is supported by the mutual contributions of a corporation and its employees, and maintained for the sole purpose of giving relief to the latter, is a charity, in the administration of which the only

duty devolving upon the company is to use reasonable care in the selection of physicians and surgeons who are reasonably competent; and having exercised this duty, the company is not responsible for their want of skill. But, according to some authorities, if an employer derives some pecuniary benefit from a hospital which he maintains for his employees, or if he contracts for a consideration to treat them when ill or injured, he is liable for the malpractice of a physican or surgeon whom he employs, notwithstanding he exercises due care in the selection of such person.''

The cases cited in support of these texts establish the rule to be that if the employer makes a profit out of the operations of a medical department, or operates it himself, the rule of *respondeat superior* applies. (See also *Rannard* v. *Lockheed Aircraft Corp.*, 26 Cal.2d 149 [157 P.2d 1] ; *Jones* v. *Tri-State Tel. & Tel. Co.*, 118 Minn. 217 [136 N.W. 741].)

Of course, in some cases, the duty assumed by the employer may be limited by contract, express or implied, and it may be simply to secure competent medical aid, in which case liability is limited to negligence in the selection. (*Socony-Vacuum Oil Co.* v. *Premeaux*, (Tex.Civ.App.) 187 S.W.2d 690; *Metzger* v. *Western Maryland Ry. Co.*, 30 F.2d 50.)

The key test as to the extent of the employer's duty seems to be whether the employer secures a financial benefit from the operation of the hospital. Thus, in *Illinois Cent. R. Co.* v. *Buchanan*, 126 Ky. 288 [103 S.W. 272, 11 L.R.A.N.S. 711], the railroad established a hospital and incorporated it as a separate entity. No financial gain accrued to the railroad from the operation. The court held that in such a case the railroad was only liable for negligence in selecting doctors and not for their negligence. But, significantly, the court stated (p. 274) : ''Of course, this view is based on the assumption that the railroad company does not derive any pecuniary profit or gain from the conduct of the institution. If such were the case, a different standard of responsibility would be established.'' (See also *Sawdey* v. *Spokane Falls & N. Ry. Co.*, 30 Wash. 349 [70 P. 972, 94 Am.St.Rep. 880].)

Thus, although the hospital may be an independent contractor in many respects, if a financial benefit accrues to the employer by the operation, the latter is liable for the negligence of the doctors in performing a duty assumed by the employer. That is this case.

Prior to the arbitration award of 1945 under which the hospital is now operated, it was held that, as a matter of law, this very hospital was the agent of the Southern Pacific so as to make that company liable for the negligence of the doctors. Prior to 1945 the hospital was supported, as now, by joint contributions of employer and employee. Nevertheless, the court held, after stating the rule that where the hospital is not operated to the financial benefit of the employer no liability for negligence of the doctors attaches (*Bowman* v. *Southern Pac. Co.*, 55 Cal.App. 734, 739 [204 P. 403]): "But there are well-reasoned cases which hold that where a railroad company, under circumstances like those indicated by the evidence here, conducts a hospital as part of a relief department, such relief department is a business arrangement on the part of the company; that the hospital is not a charity; that the contributions of the railroad employees are not voluntary; and that the physicians and attendants of the hospitals are agents of the company. Consequently, it is further held that the company is liable for the negligent acts of the physicians employed."

The only difference between that case and the present one is that now, under the arbitration award, the employer does not exercise complete control but exercises joint control, it appointing six of the 13 members of the board of managers. But the financial benefits to the appellant from the hospital operation are the same now as they were then. The particular function being performed by the hospital doctors in the instant case was the performance of the duty assumed by appellant to determine the fitness of decedent for his duties. If the facts set forth in the Bowman case were sufficient to characterize the relationship as an agency as a matter of law, so in the instant case, where the contributions and benefits are the same but the control is divided, the relationship is one of agency. Financial benefit is the same in both cases. We think financial benefit is the key to the problem. But even if control were the key, if the appellant is liable for the negligence of the doctors when it was solely in control, it must follow that when it shares control it simply shares responsibility, and is at least a joint tort feasor who can be held liable for the total damage.

Thus, although the challenged instruction may have been erroneous in telling the jury that if it found the hospital to be an independent contractor nevertheless appellant would be liable under the circumstances set forth in the in-

struction, such error could not have been prejudicial because, as a matter of law, the uncontradicted evidence establishes a case of *respondeat superior*.

The appellant also complains of the following instruction: "If you find that the defendant through one or more of its officers, agents, servants or employees knew of the weakened physical condition of plaintiff's intestate, and while then and there knowing of his weakened condition permitted and authorized him to assume duties in the employ of defendant carrier for which he was then and there physically unsuited and incapable, and knowing that he was ignorant of the limitations that should be placed on his activities, without first securing competent medical opinion approving such permission or authorization, or after having prevented such medical men from giving a competent opinion as to the suitability or capability of plaintiff's intestate by reason of the failure by an officer, agent, servant or employee of defendant carrier to correctly and fully describe and detail to said medical men the duties that would be required of plaintiff's intestate or incidental to the position of herder which he was permitted or authorized to assume, then you may find the defendant guilty of negligence, and if you further find that plaintiff's intestate's death was the proximate result of this negligence on the part of the defendant, then you will find for the plaintiff in such amount as will reasonably compensate the plaintiff under and subject to the rules I am giving you elsewhere in these instructions."

It is claimed that by this instruction a liability was imposed on appellant for failing in its duty to ascertain if decedent was physically fit for the job. No such duty generally exists. (*Potter Title & Trust Co.* v. *Ohio Barge Line,* 184 F.2d 432; *Ducombs* v. *Lykes Bros. S. S. Co.,* (La.App.) 1 So.2d 114.) In our prior opinion we held the law to be that no such duty exists, but where the employer assumes the duty it is liable if it performs such duty negligently. The challenged instruction, contrary to appellant's contention, did not tell the jury that it, as employer, was under a duty to examine employees to determine their fitness for a job. Although rather inartfully phrased, it told the jury that if the employer knew that McGuigan was in such poor physical condition as not to be able to handle the job of herder without danger to his health, and the decedent was ignorant of these limitations, the appellant was under a duty to have him ex-

amined. This is a correct statement of the law, and is in accord with common sense. (See anno. 175 A.L.R. 982.)

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 12, 1955, and appellant's petition for a hearing by the Supreme Court was denied February 11, 1955. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.