[L.A. No. 30024. In Bank. Dec. 22, 1972.]

ROBERT D. COFFEE, Plaintiff and Appellant, v.
McDONNELL-DOUGLAS CORPORATION, Defendant and Appellant;
ALAN GRAY et al., Defendants and Respondents.

552

**COUNSEL**

Young & Young, W. Herbert Young and Walter H. Young for Plaintiff and Appellant.

Haight, Lyon & Smith, Michael J. Bonesteel and Henry F. Walker for Defendant and Appellant and for Defendants and Respondents.

**OPINION**

**SULLIVAN, J.**—In this action for damages for personal injuries defendant McDonnell-Douglas Corporation[1] appeals from a judgment entered upon a jury verdict in favor of plaintiff and from an order denying defendant's motion for a judgment notwithstanding the verdict.

Plaintiff Robert Coffee, after retiring from the United States Air Force in January 1966, applied for a position as a pilot with defendant, a manufacturer of aircraft. Defendant corporation required each of its pilot applicants to undergo a pre-employment physical examination to establish his physical fitness for the job. Accordingly, on July 26, 1966, plaintiff

---

[1]Although the action was also brought against three doctor-employees of defendant, hereafter, unless otherwise indicated, all references to "defendant" are to the McDonnell-Douglas Corporation.

underwent a physical examination at defendant's Long Beach medical clinic. Among other things, the examination consisted of a review of plaintiff's medical history, extensive X-rays, urinalysis, an electrocardiogram and a blood test. Coffee, examined by Dr. Gray, one of defendant's doctor-employees, was told that the examination could not be completed until the results of the X-rays and laboratory tests were received, about one week later. However, Dr. Gray signed the examination form on the day of the examination indicating that Coffee was qualified for duties as a pilot, with the understanding that medical approval would be withdrawn if the laboratory tests or X-rays produced any negative results.

Some time later plaintiff was informed by Mr. Heimerdinger, the chief pilot in flight operations for defendant, that he had passed the physical examination and that he was acceptable for employment as a pilot. On August 9, 1966, Coffee began work.

Seven months later, on March 9, 1967, plaintiff collapsed from exhaustion after returning from an extended flight for defendant. He was admitted to the Long Beach Naval Hospital where he remained for approximately 10 days. Dr. Snyder, a hematologist, examined him and found that he had severe anemia, his kidney function was impaired, and that the bone structure of his ribs and skull had deteriorated significantly. Plaintiff's condition was diagnosed as multiple myeloma, a disease commonly referred to as cancer of the bone marrow. Dr. Snyder informed plaintiff that he had three to six months to live unless he responded to drug therapy.

Plaintiff responded favorably to the ensuing medical treatment. Initially he received several blood transfusions. He also began the daily use of drugs which caused nausea and resulting weight loss. Because the drugs prescribed made him more susceptible to infection, he also contracted hepatitis. By the fall of 1967, his condition was described as in a state of remission and the nausea stopped. At the time of the trial in November 1970, his condition was still in remission and he had been able to return to work for defendant.

Plaintiff commenced the instant action against McDonnell-Douglas and its three doctor-employees (Waters, Gray,[2] and Ruetman) alleging that defendants required plaintiff to undergo a pre-employment physical examination to determine whether or not he was physically fit to be a test pilot and that defendants performed the physical examination negligently in that they either "knew or should have known of his true condition [i.e.,

---

[2]Cora Mary Gray was later substituted for Dr. Gray as conservator of his estate.

multiple myeloma] and negligently failed to disclose" it, or that they were so negligent in the performance of the examination that they failed to discover the presence of the disease. As a proximate result of defendants' negligence, plaintiff averred, his "disease progressed and became aggravated and spread because plaintiff was without medical treatment," thereby reducing his life expectancy, lessening his resistance to other diseases, weakening his bone structure and causing loss of wages.

Two theories of liability were developed at trial: the first concerned the negligence of the doctors as agents and employees of defendant corporation, and the second theory focused on the negligence of other corporate employees, independently of the doctors' negligence. Since this appeal concerns only the latter theory, we shall now examine in the light most favorable to plaintiff the evidence relative to the independent negligence of the corporation.

The evidence shows that McDonnell-Douglas as a matter of corporate policy required each of its prospective employees to undergo a physical examination, and that plaintiff was given such an examination on July 26, 1966. Plaintiff was examined by Dr. Gray, an employee of the defendant corporation, and approved by him as physically fit for duties as a pilot. In the course of the examination a blood sample was drawn from plaintiff. The sample was sent to an independent medical laboratory on the same day and a blood test report was returned by mail to defendant's medical clinic on July 28, 1966. The blood test report was received by a secretary at defendant's medical clinic, was time-stamped, and filed. Neither Dr. Gray, the examining physician, nor Dr. Waters, the supervising physician, nor any competent medical person, reviewed or evaluated the report that had been submitted.

Dr. Waters, the supervising physician of defendant's medical clinic, testified that the policy requiring blood tests was established by the corporate office in Santa Monica. Blood tests for pilots, he explained, were necessary for the protection of the corporate employer, the pilot himself, and the public. A person employed as a pilot, he stated further, could not perform his duties unless he had "normal blood" because of the requirement that pilots fly defendant's aircraft at high altitudes. Dr. Waters also explained that, in response to the corporate policy requiring blood tests, the procedure for handling blood test reports was established by his predecessor. That procedure, according to Dr. Waters, allowed reports to be filed without evaluation by a physician.

The blood test report, produced at trial, indicated that Coffee's blood

was in the low normal or slightly below normal range for hemoglobin[3] and that the sedimentation rate was abnormally high.[4] An elevated sedimentation rate would indicate, according to the medical testimony, the presence of an inflammatory condition or even the presence of a serious disease, although it would not indicate the presence of any particular disease. Dr. Waters stated that had he seen the report, he "would have considered it high," and "would certainly want to know why this is high." In other words, the knowledge of an elevated sedimentation rate would prompt further inquiry. Additionally, Dr. Waters stated that had he seen the results of the report, plaintiff would not have been approved for employment as a pilot.

Medical testimony also established that plaintiff had multiple myeloma at the time of the examination, that it is an incurable disease, but that had the presence of the disease been discovered earlier, plaintiff would not have suffered the extent of injuries that he did.

The trial judge instructed the jury that the doctors owed plaintiff the duty to meet professional standards only if plaintiff was their patient and that plaintiff had the burden to prove the doctor-patient relationship. If the jury found that no doctor-patient relationship existed, then the doctors, as agents and employees of McDonnell-Douglas, owed a duty to refrain from injuring plaintiff and to use reasonable care. If the jury found the doctors had violated this duty, liability would be imputed to McDonnell-Douglas under the doctrine of *respondeat superior*. The trial judge also instructed as follows: "It is established by the evidence in this case that McDonnell-Douglas voluntarily undertook the medical examination of the plaintiff to ascertain if the plaintiff was physically fit to be employed by McDonnell-Douglas as a pilot. Although an employer is under no general duty to ascertain whether an employee is physically fit for the job, nevertheless if the employer undertakes and assumes such a duty the employer is liable if the employer performs it negligently."

The jury returned a verdict in favor of plaintiff and against McDonnell-Douglas in the amount of $200,000, but exonerated the three defendant-doctors. However, the trial court conditionally granted defendant a new trial on the issue of damages explaining that "the damages were excessive

---

[3]Plaintiff's hemoglobin factor (which is the constituent of the blood carrying oxygen) was measured at 12.3 grams. Medical testimony established that the normal range for a male of plaintiff's age is around 14 to 15½ grams, or not lower than 12.

[4]The sedimentation rate was 49 millimeters per hour, an abnormally high measurement according to all the medical experts. The normal range for a male of plaintiff's age is zero to 10 millimeters per hour.

for the reason that although plaintiff's condition temporarily worsened as a result of defendants' [*sic*] negligence . . . plaintiff's life expectancy was not affected." Plaintiff consented to a reduced award of $100,000 in damages; the motion for a new trial was thereupon denied; and the judgment was ordered reduced to $100,000. Defendant's motion for judgment notwithstanding the verdict, not ruled on by the trial court, was denied by operation of law. (Code Civ. Proc., § 629.) This appeal by defendant followed.[5]

Defendant makes two contentions before us: (1) That it owed no duty to plaintiff, and (2) that the verdict in favor of the defendant doctors is inconsistent with the verdict against the defendant corporation.

## I

■ An employer generally owes no duty to his prospective employees to ascertain whether they are physically fit for the job they seek, but where he assumes such duty, he is liable if he performs it negligently. (*McGuigan* v. *Southern Pacific Co.* (1954) 129 Cal.App.2d 482, 497 [277 P.2d 444]; *McGuigan* v. *Southern Pac. Co.* (1952) 112 Cal.App.2d 704, 718 [247 P.2d 415]; *Gunston* v. *United States* (N.D.Cal. 1964) 235 F.Supp. 349, 352, cert. den. 384 U.S. 993 [16 L.Ed.2d 1010, 86 S.Ct. 1904]; *Union Carbide & Carbon Corporation* v. *Stapleton* (6th Cir. 1956) 237 F.2d 229, 232-233; *Isgett* v. *Seaboard Coast Line Railroad Company* (D.S.C. 1971) 332 F.Supp. 1127, 1141.) The obligation assumed by an employer is derived from the general principle expressed in section 323 of the Restatement Second of Torts, that one who voluntarily undertakes to perform an action must do so with due care.[6]

---

[5]Plaintiff appeals from the judgment and from the "order granting defendants' [*sic*] motion for new trial unless plaintiff consents to reduction in the amount of the verdict." As to the latter, pursuant to plaintiff's consent to a reduction in the award of damages, defendant's motion for a new trial was denied. As to the former, the judgment was entered for plaintiff after a verdict in his favor. Plaintiff explains, however, that "[t]he filing of a cross-appeal was done out of caution to preserve any of plaintiff's rights that might otherwise be lost." Since the judgment in plaintiff's favor is being affirmed, the "cautionary" appeal serves no purpose. Accordingly, plaintiff's appeal from the judgment and the order must be dismissed.

[6]Restatement Second of Torts, section 323, states: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if [¶] (a) his failure to exercise such care increases the risk of such harm, or [¶] (b) the harm is suffered because of the other's reliance upon the undertaking."

On the subject of voluntary assumption of due care by affirmative conduct generally, see *Schwatrz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 238 [60 Cal.

In the case at bench, defendant, in conformity with its policy that all prospective employees undergo a physical examination, required plaintiff to take such an examination in order to ascertain if he was physically fit to perform the duties of a test pilot. Having assumed the duty to examine plaintiff, defendant also assumed the duty to conduct and complete the examination with due care.

Defendant, however, contends that the duty of an employer, within the context of a pre-employment physical examination, is a limited one; that defendant had no duty to *discover* diseased conditions in plaintiff; and, that even if it had the duty to *disclose known* results, defendant's conduct did not `constitute a breach of such duty.[7] More specifically, defendant argues, to impose on employers a "duty to discover" would "ignore the purposes" of pre-employment physical examinations and would "place an undue and unreasonable burden on prospective employers screening possible employees."

We agree that defendant did not breach a duty "to disclose" known results of the examination. We have found no evidence in the record establishing that any of the doctor-employees had actual knowledge of the contents of the blood test report showing, among other things, an abnormally high sedimentation rate and thus indicating the presence of an inflammatory condition. Obviously, having no knowledge of the results of the blood test, defendant's doctor-employees who examined plaintiff were at no time under a duty to make a disclosure.

However, we think defendant has misconceived the issue crucial in this case when it asserts that it had no duty "to discover." The question presented here is not whether defendant has assumed the duty "to discover" diseased conditions; rather, the question is whether the relationship between the parties was such that plaintiff was entitled to legal protection

Rptr. 510, 430 P.2d 68]; *Merrill* v. *Buck* (1962) 58 Cal.2d 552, 562 [25 Cal.Rptr. 456, 375 P.2d 304]; Prosser, Law of Torts (4th ed. 1971) pages 343-348; 2 Witkin. Summary of California Law (7th ed. 1960) Torts. § 241, pages 1436-1437 (1969 Supp.) pages 663, 664.

We also note that while the issue of duty was not specifically discussed in *Rannard* v. *Lockheed Aircraft Corp.* (1945) 26 Cal.2d 149 [157 P.2d 1], this court held that the complaint stated a cause of action where it alleged that the defendant-employer and defendant-doctor had negligently diagnosed plaintiff in the course of a pre-employment physical examination, and had thereafter negligently performed surgery and negligently treated plaintiff.

[7]Defendant rests this position on the distinction between a duty to discover diseased conditions and a duty to disclose known diseased conditions which is made in *Lotspeich* v. *Chance Vought Aircraft* (Tex. Civ. App. 1963) 369 S.W.2d 705.

against the wrongful conduct of the defendant.[8] ■ Such a relationship was formed here when defendant undertook, although voluntarily, to examine plaintiff so as to ascertain his physical fitness for duties as a pilot.

Defendant insists that the imposition of a duty "to discover" is an "undue burden." However, it has been said that an employer has failed to exercise due care when it fails "to disclose" diseased or dangerous conditions revealed in a physical examination. (See *Jines* v. *General Electric Company* (9th Cir. 1962) 303 F.2d 76, 79; *Union Carbide & Carbon Corporation* v. *Stapleton, supra*, 237 F.2d 229.) Yet, defendant in effect argues that if an employer fails to perform an examination with due care and thereby fails "to discover" the presence of such a condition, he should not be held liable. In other words, defendant's liability would be limited by the commission of its negligent acts. We cannot approve of such a result.

■ At the same time we do not say that an employer, once having required a prospective employee to submit to a physical examination in order to ascertain his fitness for the job, assumes an absolute obligation to discover any diseased conditions. In our view the proper test is this: whether the employer in such instance is liable for not discovering the disease depends upon whether or not in the light of all of the circumstances he conducted and completed the examination with due care. Included among the relevant circumstances is the purpose of the examination.

In the matter before us, the purpose of the physical examination was to determine plaintiff's physical fitness as a pilot. ■ In order to examine prospective pilots properly, defendant decided it was essential to take a blood sample and subject it to analysis. The blood test report, indi-

---

[8]The concept of duty is discussed in Prosser, Law of Torts (4th ed. 1971) page 324, wherein it is stated: "It is quite possible, and not at all common, to deal with most of the questions which arise in a negligence case in terms of 'duty.' Thus the standard of conduct required of the individual may be expressed by saying that the driver of an automobile approaching an intersection is under a duty to moderate his speed, to keep a proper lookout, or to blow his horn, but that he is not under a duty to take precautions against an unexpected explosion of a manhole cover in the street. But the problems of 'duty' are sufficiently complex without subdividing it in this manner to cover an endless series of details of conduct. It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty."

cating an inflammatory condition in plaintiff, was never seen by defendant's medical employees because of a corporate procedure allowing the report to be filed without evaluation. The question posed, already answered by the jury in the affirmative, was whether in the exercise of due care, defendant "should have known" of the results of the blood test. (See *Jines* v. *General Electric Company, supra,* 303 F.2d 76, 79.) Viewed in this context, the failure "to discover" the inflammatory condition in plaintiff was the consequence of defendant's own negligence.

## II

Defendant next contends that plaintiff's claim was grounded on the alleged negligence of its doctor-employees, Waters, Gray and Ruetman, and that the sole basis of any liability was that asserted under the doctrine of *respondeat superior.* ■ Since the three doctors were exonerated by the jury, defendant argues that the verdict *in favor* of plaintiff and against defendant is inconsistent with the verdict *against* plaintiff and in favor of defendant doctor-employees.[9] As part of this argument, defendant urges that Dr. Waters, the supervising physician, was solely responsible for the operations of the medical clinic, including the handling of blood test reports, and that only he could have been negligent, if anyone was. We find no merit in the contention.

If the sole basis of plaintiff's theory of recovery had been in fact the negligence of the doctors, then the verdicts might have been inconsistent. But the record supports no such interpretation. Indeed it shows that in addition to claiming negligence on the part of the three doctors, plaintiff asserted that defendant corporation, independently of the conduct of the doctors, was negligent in the procedures established by it for the handling of blood test reports. This theory was consistent with the plaintiff's complaint.[10] In any event the record reveals that the liability of the corporate defendant for the acts of *any* of its agents, not merely for those of its doctor-employees, was one of the issues to be adjudicated and that both the parties and the court proceeded throughout the trial upon that theory. (See *Miller* v. *Peters* (1951) 37 Cal.2d 89, 93 [230 P.2d 803]; 6 Witkin, Cal. Procedure (2d ed. 1971) pp. 4271-4272.)

[9]Defendant cites *Freeman* v. *Churchill* (1947) 30 Cal.2d 453 [183 P.2d 4]; *Cox* v. *Certified Grocers of Cal. Ltd.* (1964) 224 Cal.App.2d 26, 31 [36 Cal.Rptr. 48]; and *Spruce* v. *Wellman* (1950) 98 Cal.App.2d 158 [219 P.2d 472].

[10]Contrary to defendant's claim, plaintiff's complaint is consistent with this theory of the case. It alleges in substance that defendants, including the corporate defendant as well as the doctors, negligently performed the physical examination.

The jury could have reasonably concluded, in the light of the evidence adduced, that defendant doctors were not negligent but that defendant corporation was negligent. The evidence shows that even though Dr. Waters was the supervising physician, the procedure for the handling of blood tests and their reports was established by his predecessor, in response to the corporate policy requiring that blood tests be performed. Moreover, it was Dr. Gray, not Dr. Waters, who examined plaintiff. Although Dr. Gray approved plaintiff for the job on the day the examination was conducted, plaintiff was told that he would not be actually approved for employment until the results of the laboratory tests were obtained. A reasonable inference could be drawn that Dr. Gray relied on the corporate procedure concerning blood tests and their reports, and that he properly assumed that if any significant results were obtained, he would be told about them. Instead, in accordance with the established corporate procedure, the blood test report, after its return to the medical clinic and receipt by a secretary, was time-stamped and filed without Dr. Gray, Dr. Waters, or any physician being informed of the results. The unreviewed and unevaluated blood test report showed the presence of an elevated sedimentation rate, which according to all the medical testimony, is indicative of an inflammatory condition and would prompt further inquiry. Had any of the physicians been informed of the results of the blood test, Dr. Waters admitted, plaintiff would not have been approved for employment.

The negligence of defendant corporation, therefore, independently of the conduct of the defendant doctors, consisted of its failure to establish a proper procedure for evaluation of blood test reports. Consequently, we think the jury could have reasonably concluded that although the doctors individually acted with due care, defendant corporation was negligent in failing to exercise due care in the handling of the blood test reports.

The question of independent negligence is raised in *McGuigan* v. *Southern Pac. Co., supra,* 112 Cal.App.2d 704, 718. Although the action did not arise under California law, we find its reasoning appropriate. There the evidence was sufficient to establish negligence on the part of the employer in incorrectly describing the duties to be performed by decedent. A physician employed by the defendant corporation, in reliance on the statement of another employee of the corporation, which incorrectly described the duties to be performed, allowed plaintiff's decedent to return to work, thereby causing his death. Commenting on the liability of the corporation, the *McGuigan* court stated, ". . . independent of any question of malpractice on the part of the doctors, or of the employer's liability for such negligence, we have evidence which, if believed, would sustain a

finding of negligence on the part of the employer, and a finding that such negligence was a contributing cause of the death . . . ." (*Id.* at p. 718.) Similarly, there is evidence of negligence in this case, independently of the conduct of the doctors, in the form of an inadequate procedure for the handling of blood test reports.

Finally, we note that defendant has advanced no separate arguments in regard to its appeal from the order denying its motion for judgment notwithstanding the verdict. Defendant's position appears to be that acceptance of one or both of its contentions on appeal would require us to reverse such order and direct that a judgment be entered in its favor. Since, as we have shown, there is no merit to either of defendant's contentions, the order denying its motion for judgment notwithstanding the verdict was proper.

Plaintiff's purported cross-appeal from the judgment, and from the order dated January 13, 1971, conditionally granting defendant a new trial on the issue of damages, is dismissed. The judgment is affirmed. The order denying defendant's motion for a judgment notwithstanding the verdict is affirmed. Plaintiff shall recover his costs on appeal.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.