[No. E010767. Fourth Dist., Div. Two. May 4, 1994.]

URI ROTMAN, Plaintiff and Appellant, v.
MACLIN MARKETS, INC., Defendant and Respondent.

## COUNSEL

Lewis Graham for Plaintiff and Appellant.

Bruggeman, Smith & Peckham, Daniel W. Smoke and Harry C. Carpelan for Defendant and Respondent.

## OPINION

**HOLLENHORST, J.**—Plaintiff Uri Rotman filed a complaint for damages for negligence and breach of an oral agreement. The trial court granted a motion for a nonsuit on the contract cause of action at the close of plaintiff's case-in-chief on grounds that there was no evidence to support the allegation that there was an oral contract to provide security services to plaintiff. The court granted a motion for a directed verdict on the negligence cause of action at the conclusion of defendant's case.

Plaintiff appeals, contending that he was owed a duty on both the contract and negligence causes of action. We affirm.

### FACTS

Plaintiff Rotman testified that he had, since 1980, conducted a jewelry business by leasing space in an open air market run by defendant Maclin

Markets, Inc. The market premises consisted of eight to ten fenced acres. Approximately 300 vendors sell goods at the market 2 days a week. Defendant employed three security guards for the premises.

On December 31, 1985, Mr. Rotman arrived at the market. At that time, 7:45 a.m., the market was open to vendors, but not to the general public. Following his usual procedure, he parked his car next to his stand, unloaded his jewelry suitcase, and placed it under a display table. His assistant then left to park the car. A man then distracted him with some questions while a second man stole the suitcase.

Mr. Rotman immediately discovered the theft, started screaming and contacted a security guard in the parking lot. Mr. Rotman returned to his stand within 10 minutes. Mr. Rotman then reported the theft to the security guards and the police. He testified that the value of the jewelry was $122,872.

A witness testified that she saw a man with a jewelry case leave the premises within three to ten minutes of the theft. Mr. Brown, the head of security, had seen the man walking with the jewelry case about five minutes before Mr. Rotman reported the theft to him. Upon receiving the report, he broadcast the description and began looking for the man.

Two men were eventually arrested and prosecuted for the crime. However, they were acquitted and the jewelry was never recovered.

### STANDARD OF REVIEW

■  On reviewing the nonsuit on the contract theory, the following rule applies: "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. . . . [T]he evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . . [¶]  ■  In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

■  On reviewing the directed verdict on the negligence theory, the following rule applies: "On appeal from a judgment on a directed verdict,

appellate courts view the evidence in the light *most favorable to appellant.* All conflicts must be resolved and inferences drawn in appellant's favor; and the judgment will be reversed if there was substantial evidence . . . tending to prove all elements of appellant's case." (Eisenberg, Cal. Practice Guide, Civil Appeals and Writs (The Rutter Group 1993) ¶ 8:138, p. 8-47, citing *Estate of Fossa* (1962) 210 Cal.App.2d 464, 466 [26 Cal.Rptr. 687].) We should therefore reverse the trial court if we find substantial evidence supporting plaintiff's contract or negligence theories.

## THE NONSUIT ON THE CONTRACT THEORY

In his opening brief, plaintiff states the basis for his contract claim as follows: "[A]t the time appellant leased the subject space from respondent in late 1979 or early 1980, appellant did so with reliance upon the respondent's conduct when respondent knew full well appellant was in the jewelry business, of showing appellant around the facilities, stating, among other things, to appellant 'We have security guards which protect, you know, and make—make it more secure, and it's all fenced and everything.', and allowing appellant to view the security guards in the area, all knowing full well that appellant was concerned about security, and breached that oral lessee vendor agreement by not furnishing or supplying proper or competent security guards, but rather furnished and supplied illusory security procedures; and, as the result thereof, appellant suffered damages by the theft of his jewelry."[1]

Although the complaint alleges an oral agreement to provide adequate security at all times, Mr. Rotman, in his testimony, did not support the allegation. Instead, he testified to the statement quoted above. He also testified that the security guards had taken care of problems when he brought the problems to their attention.

On cross-examination, Mr. Rotman was specifically asked if Mr. Larsen, the representative of defendant, had ever told him "that part of your agreement with him was that he would provide security guards who would safeguard and protect your jewelry?" Mr. Rotman replied: "Again, I don't

---

[1]In response, defendant produced a vendor terms and conditions, signed by plaintiff Rotman, which states: "Vendors will maintain their spaces and conduct their business in a safe and orderly manner. Vendors hereby exonorate [*sic*] [and] hold harmless the sales company and its employees from any liabilities arising out of injury to persons or property resulting from vendor using these facilities." The document does not otherwise mention security as a service which is provided or not provided by the lessor. Mr. Rotman acknowledged that he signed the document. Defendant apparently intended to argue that this provision of the written contract governed security and risk of loss and that evidence of the alleged oral agreement would therefore violate the parol evidence rule. (Code Civ. Proc., § 1856.)

remember him using specifically the word 'agreement,' but in the presentation of him to me explaining about what comes along with being a permanent member of the auction is the facilities, the security, the comfort, so on and so forth, and the amount of people which coming in."

When the motion was made, plaintiff's attorney was unable to point to any specific evidence of an oral agreement. He said: "[T]he only basis upon which there could be an assertion would be a breach of an implied contract by virtue of the conduct of Maclin Market, to wit, exposing the proposed vendors, members of the general public, for that matter, to the existence of the security guards without publishing a disclaimer of some type or kind . . . . [¶] I would say that [the statement that the security guards are there for your protection] might constitute an oral contract conceivably, not just an implied contract, but at the very least it would be conduct upon which they have a right to rely . . . ."

When the court pointed out there was no evidence of an offer and acceptance, plaintiff's attorney stated: "Well, I have no other evidence, your Honor, other than the fact of the representations made by Mr. Brad Larsen to Mr. Rotman and Mrs. Rotman when they leased the premises."

Plaintiff now argues that "it may reasonably be inferred from the words and conduct of Brad Larsen that one of the provisions of the subject oral lease agreement was that the lessor was to furnish and supply average reputable security guards to protect its vendors and their property . . . ."

We would characterize plaintiff's desired "inference" as more of a hope or desire of plaintiff's rather than evidence of an agreement to provide guards to protect a vendor's personal property in his stall.[2] As respondent states, "There was no bargaining for such a security agreement, even giving Mr. ROTMAN's vague testimony the fullest inference. There was no consideration exchanged, there were no signs of mutual consent or a mutual meeting of the minds regarding such a separate contract, which by its very nature would negate the specific written contract which indicated <u>no</u> agreement by MACLIN MARKETS, INC. to secure or defend vendor ROTMAN's personal property."

The trial court found no evidentiary basis for an oral agreement, and we think that the trial court was correct. The granting of the motion for a nonsuit on the contract cause of action was therefore proper.

---

[2] If defendant agreed to protect the property of each vendor on the premises, he would practically need a security officer assigned to each vendor to determine if the persons moving the property were authorized to do so. This would require at least 300 officers, rather than the 3 officers used here.

## THE DIRECTED VERDICT ON THE NEGLIGENCE THEORY

■   Plaintiff's original basis for the negligence claim was that the defendant was negligent in failing to provide adequate security for vendors on the premises. Subsequently, he argued that, once the security guards were notified of the theft, they performed their duties in a negligent manner.

The trial court granted the motion for a directed verdict on grounds that the landlord does not have a legal duty to provide security for the tenant under *Royal Neckware Co. v. Century City, Inc.* (1988) 205 Cal.App.3d 1146 [252 Cal.Rptr. 810].

In *Royal Neckware*, the tenant of a shopping center sued the landlord for damages resulting from burglary losses. The tenant's lease obligated the mall's tenants to pay for common area costs, including security costs, but the shopping center decided what level of security services to provide.

The tenant argued that the trial court erred in refusing to give an instruction that a commercial landlord has a duty to protect its tenants from reasonably foreseeable criminal conduct. (*Royal Neckware Co. v. Century City, Inc., supra,* 205 Cal.App.3d 1146, 1150.) The court held that the landlord had no such duty to protect the tenant's property. (*Id.,* at p. 1151.) It said: "We cannot find such a duty exists because it is the tenant that is in the best position to take steps to protect the safety of its own property; there is no moral blame to be ascribed to a failure to prevent another's property from being stolen; it would place an onerous financial burden on a landlord —which eventually would be passed on to all of its tenants—to hold it responsible for the loss of its tenants' property; and a tenant can easily obtain insurance to cover any such loss." (*Id.,* at p. 1152.)

Appellant, and the dissenting opinion, attempt to avoid the effect of *Royal Neckware* by arguing that it is inapplicable to the situation in which a person voluntarily assumes a duty to provide a service. Specifically, they argue that there was substantial evidence that defendant Maclin voluntarily assumed a duty to protect Rotman's property from theft, and to apprehend the perpetrator of any theft which it was unable to prevent.

We disagree. "We are, however, unaware of any case in which a judgment against the property owner has been affirmed solely on the basis of a failure to provide an adequate deterrence to criminal conduct in general." (*Noble v. Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 916 [214 Cal.Rptr. 395].) Even if we assume that the voluntary assumption of a duty to guard

Mr. Rotman's jewelry would avoid the effect of *Royal Neckwear*, there was no substantial evidence of such an assumption here.[3]

The evidence cited includes the testimony of defendant's chief of security, Jeffrey Brown, the testimony of Mr. Larsen, and the testimony of the Rotmans.

Mr. Brown testified that his duties were "to care for Maclin Markets' property and to protect life and limb, as provided by the laws under a security officer's duties and to observe and report any instances that may occur that would need to be reported to the proper authorities."

Mr. Brown emphasized his opinion of the distinction between a security officer and a police officer: He thought that both can arrest for crimes committed in their presence, but that the security officer cannot arrest for crimes not committed in his presence. Since a security officer did not observe the theft of Mr. Rotman's property, Mr. Brown's understanding of his authority was that he could only detain a suspect in order for Mr. Rotman to make a citizen's arrest.

Obviously, as Mr. Brown testified, the presence of the officers acted as a visual deterrent to theft and other crimes and the security officers would take action if they saw a crime being committed. If, as here, an unobserved theft was committed, Mr. Brown testified that he would attempt to apprehend the suspect and would report the crime to the proper authorities.[4] As the defense expert testified, the primary job of a security guard is to protect the property of his employer, to provide a visible deterrent, and to observe and report crimes. A security guard is not, and should not be expected to be, a police officer.

We find nothing in Mr. Brown's testimony to support the conclusion that he or defendant agreed to guard Mr. Rotman's jewelry. It is one thing to say that a security officer will act when he sees a crime being committed. It is a completely different thing to say that a security officer agreed to guard the property of one specific vendor, out of over 300 vendors on the premises.

Mr. Larsen testified that the market, as the landlord, has never considered itself responsible for the safekeeping of the vendor's merchandise. The

---

[3]The landlord in *Royal Neckware* provided mall security but there was no contention there that it thereby assumed an obligation to protect each individual tenant's personal property from burglary.

[4]Plaintiff's security expert faulted the security officers for not having a contingency plan and in not observing the perimeter of the market before searching the interior for the thief. Mr. Brown testified to the contrary and the defense expert, a former San Bernardino police chief, had no criticism of the actions of the security officers.

vendors were, of course, free to hire their own security guards if they desired. The guards hired by defendant were intended to provide traffic and crowd control, to render first aid and to call for medical assistance, to prevent vandalism in the bathrooms, and to protect the funds collected from the vendors and the public. He would also expect the officers to provide a visual deterrence to crime, and to act if they saw a crime being committed, within their citizen's arrest powers. If they did not see a crime being committed, they would nevertheless attempt to assist the victim in arresting the suspect, and they would report the crime to the authorities.

The market manager, Diane Bowman, testified that "it was pretty well known that security was for Maclin Markets . . . protection of the funds that we collect, crowd control and traffic control." She also mentioned the protection against vandalism and enforcement of the vendor rules and regulations as part of the duties of the security officers.

In our view, nothing in the testimony of Mr. Larsen or Ms. Bowman provides a basis for an inference that the defendant agreed to protect Mr. Rotman's jewelry, or the property of any other vendor, from theft. As Mr. Larsen stated: "All these shops—there's hundreds of shops out there—are individual operators, and we don't have hundreds of security guards that we would provide to them. That's not a service we provide . . . ."

Mr. Rotman testified that Mr. Larsen told him that the market provided security guards to make the market more secure and to take care of any problems that arose in the market. He testified that he had had specific problems with other vendors and suspicious persons and that the security guards had taken care of those problems. For example, he testified that, when suspicious persons were nearby, Mr. Brown told him not to worry, saying "We'll take care of you. Don't worry. We're all under control." He also testified that Mr. Brown gave him similar assurances when Mr. Brown became head of security.

Mrs. Rotman also testified that Mr. Larsen introduced the security persons by stating that they would "take care of any problems that happen in the swap meets."

Mr. Rotman's assistant testified that similar assurances were given to her, and that she was led to believe that the security officers were there to protect her.

As noted above, our standard of review requires us to view the evidence in the light most favorable to appellant and to determine whether there was

substantial evidence to support the negligence theory. Applying this standard to the testimony, we find that the testimony does not support the conclusion that defendant or its security guards ever voluntarily assumed the responsibility of safeguarding Mr. Rotman's jewelry from theft.[5] Indeed, all of the evidence indicates that the security officers were there to provide parking and crowd control, to safeguard defendant's property, to provide a deterrent to theft and other misbehavior in the market, and to enforce defendant's rules and regulations against the vendors. The security officers, having only the power of citizen's arrest, would act if crimes were committed in their presence. However, if crimes were not committed in their presence, they could only assist the victim in making a citizen's arrest, and they would report the crime to law enforcement.

In particular, the testimony presented by plaintiff, including that of Mr. Rotman, does not provide substantial evidence that defendant or its security guards ever agreed to assume the responsibility of guarding his jewelry from theft whenever he was on the premises.

The dissent relies on *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142 [274 Cal.Rptr. 901], a summary judgment case. The court there concluded that evidence that a bartender had an agreement to hold the patron's car keys, and not to release them if the patron was under the influence of alcohol at the end of the evening, created a triable issue of fact. In that case, there was substantial evidence of such an agreement. Here there was none. Without such evidence, there is simply no conflict for the jury to resolve.

In the absence of any evidence that defendant voluntarily assumed a duty to protect plaintiff's jewelry, the plaintiff cannot prevail, even if there was evidence from which the jury could find that the security officers did not act as reasonably prudent security officers once they were notified of the theft. In other words, the substantial factual conflicts on breach of duty, causation and damages did not need to be submitted to the jury in the absence of evidence of a voluntarily assumed duty. (Cf. *7735 Hollywood Blvd. Venture v. Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528].)

Accordingly, we find that the trial court properly granted the motion for a directed verdict on the negligence cause of action.

---

[5]To find a voluntary assumption we would have to find that this commercial landlord agreed to act as an insurer of each tenant's personal property. There was no evidence of such an agreement here.

## DISPOSITION

The judgment is affirmed.

Dabney, Acting P. J., concurred.

**McKINSTER, J., Concurring and Dissenting.**—I agree with the majority that Rotman failed to introduce evidence to support the existence of a contract to provide security services to Rotman. Accordingly, I concur in the majority's disposition regarding the contract cause of action. However, I respectfully dissent from the affirmance of the directed verdict on the negligence cause of action. In my evaluation, the jury could have found that Maclin had assumed the duty to provide security.

The first cause of action of Rotman's complaint alleges that Maclin negligently failed to provide adequate security for the vendors in the market, as a proximate result of which Rotman's jewelry was stolen. After the nonsuit was granted as to the contractual claim, the jury trial proceeded as to the negligence theory. After Maclin had rested its defense, and at the trial court's suggestion, Maclin moved for a judgment of nonsuit and for a directed verdict on the ground that Rotman had failed to present evidence that Maclin had a duty to protect Rotman's property, relying on *Royal Neckwear Co. v. Century City, Inc.* (1988) 205 Cal.App.3d 1146 [252 Cal.Rptr. 810] (*Royal Neckwear*).[1]

In response to Maclin's contention that it had no duty to protect the vendors' property, Rotman argued that even if the law did not impose such a duty upon Maclin by virtue of the commercial landlord-tenant relationship, a jury could conclude from the evidence that Maclin had voluntarily assumed that duty. The trial court nevertheless granted the motion for directed verdict, mistakenly concluding from *Royal Neckwear* that there is "no duty on the part of a commercial [landlord] to guard the property of a tenant, whether he undertakes to do so or not."

The general rule is that a person (the defendant) who has not created a peril has no duty to protect another person (the plaintiff) from that peril, and thus incurs no tort liability for failing to do so, unless either (1) there is some

---

[1]Actually, Maclin never expressly stated the ground for the motion. However, the motion was prompted by the trial court's suggestion that Maclin renew its earlier motion for nonsuit, which as to the negligence count had been based on an alleged lack of evidence of facts giving rise to a duty. Moreover, when the trial court explained its concerns at the beginning of the hearing on the motion for directed verdict, it focused on the lack-of-duty analysis in *Royal Neckwear*. Thus, it is clear that the motion for directed verdict was brought on the ground of a lack of evidence of any duty by Maclin to protect Rotman's property.

relationship between them which gives rise to a duty to act, or (2) the defendant has voluntarily assumed that duty by undertaking to protect the plaintiff. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Weissich* v. *County of Marin* (1990) 224 Cal.App.3d 1069, 1076-1077 [274 Cal.Rptr. 342].)

Whether a particular relationship gives rise to a duty to act is a question of law. (*Clarke* v. *Hoek* (1985) 174 Cal.App.3d 208, 216 [219 Cal.Rptr. 845].) The issue in *Royal Neckwear* was whether a commercial landlord who has notice of previous criminal activity by third persons on the landlord's premises, such as burglaries of stores in a shopping mall owned by the landlord, owes a duty to its tenants to take reasonable steps to protect the tenants' stores from similar criminal activity on the landlord's premises in the future. (205 Cal.App.3d at p. 1151.) The Second District held that the relationship between a commercial landlord and its tenant does not give rise to a duty to protect the tenant's property. (*Id.*, p. 1152.) Rotman does not challenge that holding and neither do I.[2]

However, while *Royal Neckwear* holds that a duty to protect a commercial tenant's property is not imposed by law, it does not address the second exception to the no-liability rule. In particular, it does not hold that the law will not enforce such a duty which has been voluntarily assumed by the landlord. Although one could argue from the facts in *Royal Neckwear* that the owner of the shopping center had assumed such a duty, that argument was not made there. "Opinions are not authority for issues they do not consider." (*Palmer* v. *Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 539 [238 Cal.Rptr. 363].) Accordingly, *Royal Neckwear* does not support the trial court's conclusion that even if Maclin had assumed a duty to protect Rotman's property, that duty was not enforceable.

To the contrary, it has been repeatedly held that when someone who is under no obligation to provide a service to another voluntarily undertakes to do so, he will be regarded as having assumed a duty to provide that service, and will be liable for negligence if he fails to use reasonable care in performing that duty. (See, e.g., *Coffee* v. *McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 557, fn. 6 [105 Cal.Rptr. 358, 503 P.2d 1366]; *Schwartz* v.

---

[2]While acknowledging that numerous cases have found that a landlord has a duty to protect its tenants, *Royal Neckwear* draws a distinction between a duty to protect the tenants from personal injury and a duty to protect the tenants from a pecuniary loss of property, and distinguishes those contrary cases on that basis. (205 Cal.App.3d at pp. 1151-1152.) The analysis in support of its announcement of that critical distinction is rather brief. However, there is no occasion to decide in this case whether that conclusion is correct, because Rotman conceded in the trial court that there was "no question" but that *Royal Neckwear* correctly states the law.

*Helms Bakery Limited* (1967) 67 Cal.2d 232, 238 [60 Cal.Rptr. 510, 430 P.2d 68]; *Hayes* v. *Richfield Oil Corp.* (1952) 38 Cal.2d 375, 384 [240 P.2d 580]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 868, pp. 234-235.) In particular, ". . . a landlord may be liable to his tenant for misfeasance in negligently performing a task that he has assumed. In such case he owes a duty to the tenant to perform such task with reasonable care." (*Black* v. *Partridge* (1953) 115 Cal.App.2d 639, 645 [252 P.2d 760], and cases cited therein; and see 4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 598, pp. 777-778.)

Whether a defendant has voluntarily assumed duties above and beyond those imposed by law is a question of fact for the jury. For instance, in *Williams* v. *Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142 [274 Cal.Rptr. 901], the plaintiff was injured in an accident after he had driven away from a bar, apparently after imbibing too much alcohol. He sued the bar, which then moved for summary judgment on the ground that it was statutorily immune. (Civ. Code, § 1714.) He opposed the motion for summary judgment with evidence that when visiting the bar, on that and on prior occasions, he would give his keys to the bartender, to be returned only if he was able to drive when he was ready to leave. The trial court granted summary judgment in favor of the bar, but the Court of Appeal reversed. It held that although the bar had no duty to the plaintiff imposed by law, the evidence that the plaintiff had placed his keys with the bartender was sufficient to create a triable issue of fact as to whether the bar had voluntarily undertaken the duty to withhold the plaintiff's keys if he was not fit to drive his vehicle. (225 Cal.App.3d at pp. 145, 151.)

Contrary to the majority, I believe that there is comparable evidence from which a jury could have found that Maclin had assumed the duty to provide security for Rotman's property. Rotman and his wife testified that Larsen told them that Maclin employed security guards to make the market more secure and to take care of any problems that happen in the market. Rotman also recalled an occasion when he expressed his concern to one of the security guards regarding "shady characters" and gang members in the market, and the guard replied, " 'Don't worry about it. We'll take care of you. Don't worry. We're all under control.' " He also recalled that when he first met Maclin's chief of security, he told Rotman, " 'I'm the head of the security here and, you know, we organize the security here, and if you have any problems, we're aware of your sensitivity, you know, being a jeweler, you don't have to worry . . . .' "

Similarly, Rotman's employee testified that the security guards told her that if she had any problems, she should let them know. Accordingly,

whenever she had a problem, she would go to the security guards, and they would usually take care of it. For instance, when she saw someone who looked suspicious, she would alert the security guards, who would respond, " 'Don't worry about it; we'll take care of it.' " The guards gave her the impression that they were there to help keep thefts from occurring.

Maclin's chief of security testified that his duties included being a visual deterrent to criminal activity, including thefts, and attempting to apprehend any perpetrators of crimes which he had witnessed. "As much as possible within the limits of security officers' rights and the rights of private citizens['] arrest," the guards were to prevent crimes against the vendors. If a theft occurred, their goal was to attempt to catch the thief and to have the person in whose presence the theft was committed place the thief under citizen's arrest.

While Larsen denied at trial that Maclin has ever attempted to provide security services to the vendors, he also testified that one of the purposes of the security guards was to visually deter any "undesirables" from committing any kind of criminal activity, for the benefit of "Maclin Markets and everybody . . . ." Furthermore, if one of the guards witnessed a vendor being robbed, Larsen expected the guard to assist the vendor by making a citizen's arrest, if that could be done safely. If he did not witness the offense, the guard would be authorized but not required to assist the vendor in finding the robber, as a gesture of good will, a "kind of a Good Samaritan thing . . . ."

The majority concludes that this is not substantial evidence tending to prove that Maclin assumed a duty to protect Rotman's property. However, in reaching that conclusion, it focuses, not on the evidence supporting the existence of an assumption, but rather on conflicting evidence which tends to disprove any such assumption. (Maj. opn., *ante*, p. 1716.) This is contrary to the standard governing our review: "In our consideration of this appeal we must take as true all evidence tending to prove the [plaintiff's] case, together with all reasonable inferences to be drawn from such evidence, [and] disregard all evidence which does no more than raise a conflict with that of the [plaintiff]." (*Estate of Fossa* (1962) 210 Cal.App.2d 464, 466 [26 Cal.Rptr. 687].)

Applying that standard of review, I find that the testimony of these witnesses, and particularly that of the chief of security, constitutes substantial evidence from which a jury could find that Maclin had voluntarily assumed the duty to protect Rotman's property from theft and to apprehend

the perpetrator of any theft which it was unable to prevent. Thus, in my opinion the trial court erred in concluding that there was no evidence that Maclin owed a duty to Rotman and in directing a verdict in Maclin's favor.

I would reverse the judgment.